ORIGINAL
FILED

AUG 8 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1    Kim E. Miller (CA Bar. No. 178370)
      Kim.Miller@kgscounsel.com
2    Kahn Gauthier Swick, LLC
      12 E. 41st St., 12th Floor
3    New York, NY 10017
      Tel: (212) 696-3730
4    Fax: (504) 455-1498

5    Lewis S. Kahn
      Lewis.Kahn@kgscounsel.com
6    Kahn Gauthier Swick, LLC
      650 Poydras Street, Suite 2150
7    New Orleans, LA 70130
      Tel: (504) 455-1400
8    Fax: (504) 455-1498

9    *Plaintiff's Counsel*
      [Additional Counsel Listed on Signature Page]

E-filing

10

11                  UNITED STATES DISTRICT COURT

12                  NORTHERN DISTRICT OF CALIFORNIA

13                       SAN FRANCISCO DIVISION

MMC

14   ZURICH AMERICAN INSURANCE        CV No. 08        3797
      COMPANY,

15                              Plaintiff,        **CLASS ACTION COMPLAINT**

16        v.

17   GENENTECH, INC., INTERMUNE, INC.,
      AND W. SCOTT HARKONEN

18

19                              Defendants,

20                **CLASS ACTION COMPLAINT**

21        NOW INTO COURT, comes Plaintiff, ZURICH AMERICAN INSURANCE COMPANY,

22   on behalf of itself and all others similarly situated, who paid for the drug ACTIMMUNE®, and

23   who alleges the following upon information and belief.

24                       **NATURE OF THE ACTION**

25        1.        This is a nationwide class action on behalf of all third-party payors who paid for

26   ACTIMMUNE® ("Actimmune") brand of interferon gamma, alleging fraud and other illegal acts

27

28

CLASS ACTION COMPLAINT                    - 1 -

1    by Defendants in their marketing and sale of the drug for the treatment of iodiopathic pulmonary

2    fibrosis ("IPF").

3        2.    Plaintiff alleges substantive and conspiracy violations of the Racketeer Influenced

4    and Corrupt Organizations Act (RICO") in violation of 18 U.S.C. §§ 1962 c) and d); violations of

5    various state consumer protection laws; and unjust enrichment.

6        3.    Plaintiff, and the proposed nationwide class of third-party payors, suffered

7    economic damages as result of Defendants' willing, knowing, deceptive, unfair, unconscionable,

8    and fraudulent conduct.  These economic damages were a direct and foreseeable consequence of

9    Defendants' conduct, and resulted in plaintiff and the proposed class of third-party payors bearing

10   greater than 99% of the economic damages, as opposed to consumers, caused by Defendants'

11   fraudulent and illegal marketing of Actimmune.

12                                **PARTIES**

13       4.    Plaintiff, Zurich American Insurance Company ("Zurich"), is a New York

14   corporation with its headquarters located at 1400 American Lane, Schaumburg, Illinois.  Zurich

15   provides health and pharmacy benefits to its insureds in all 50 states, the District of Columbia, and

16   several U.S. territories.  During the Class Period Zurich has paid for prescriptions of Actimmune

17   prescribed to treat IPF and has suffered damages as a result of Defendants' illegal and wrongful

18   conduct alleged herein.

19       5.    Defendant, Genentech, Inc. ("Genentech"), is a Delaware corporation with its

20   principal place of business in California and its headquarters is located at One DNA Way, San

21   Francisco, California.  Genentech, at all relevant times, developed, manufactured, marketed, and

22   sold in interstate commerce Actimmune.

23       6.    Defendant, InterMune, Inc. ("InterMune"), is a Delaware corporation with its

24   principal place of business in California and its current headquarters is located at 3280 Bayshore

25   Blvd. Brisbane, California.  InterMune was originally incorporated in California in May, 1998, but

26   reincorporated as a publicly traded corporation under the laws of Delaware in March, 2000.

27   InterMune markets pharmaceutical products, but does not research, develop, or manufacture them.

28   InterMune, has marketed Actimmune since 1998.

CLASS ACTION COMPLAINT                    - 2 -

7.    Defendant, W. Scott Harkonen ("Harkonen"), was the chief executive officer of InterMune from February 1998 through June 30, 2003, and a member of InterMune's board of directors from February 1998 through September 2003; prior to that he had been a Senior Vice President of Connetics Corp. Harkonen is, and was at all relevant times, a resident of California.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because Plaintiff and at least one member of the proposed nationwide Class is a citizen of a State different from any of the Defendants' corporate residences, and the aggregate amount in controversy exceeds $5,000,000.

9.    This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Cause of Actions I and II arise from the Federal RICO statutes. This Court has further subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

10.    This Court has personal jurisdiction over Defendants, which reside and/or are licensed to conduct and/or systematically and continuously conduct business in this State, including marketing, advertising and selling drugs, including Actimmune, to residents in this State.

11.    Venue is proper in this District pursuant to 28 U.S.C. § 1391, because Defendants engaged in substantial conduct relevant to Plaintiff's claims within this District and caused harm to Class members residing within this District. Defendants all do substantial business in the State of California and within this Federal District, and at all times relevant hereto, Defendants developed, manufactured, promoted, marketed, distributed, tested, warranted and sold in interstate commerce Actimmune.

## FACTUAL ALLEGATIONS

### Development of Actimmune

12.    Interferon gamma is one of three kinds of interferon that occur naturally in the human body. Each interferon has distinct functional and biochemical properties. These interferons bind to specific cell surface receptors and initiate a sequence of events that leads to the transcription of interferon-stimulated genes.

13.    In the 1980's, Genentech created a bioengineered form of interferon gamma that could be produced in the lab, which the company subsequently developed and marketed as Actimmune.

14.    Actimmune is a "drug" within the meaning of 21 U.S.C. § 321(g)(1)(B) and (C), and it is a "prescribption drug" within the meaning of 21 U.S.C. § 353(b).  Actimmune is an injectable drug that is usually administered in a hospital clinic or physician's office; it cannot be purchased at a retail pharmacy.

15.    In 1990, Genentech was granted approval by the U.S. Food and Drug Administration ("FDA") to market its bioengineered form of interferon gamma as Actimmune for reducing the frequency and severity of serious infections associated with Chronic Granulomatous Disease ("CGD").

16.    IPF, also known as cryptogenic fibrosing alveolitis, is a chronic, progressive interstitial lung disease with an unknown cause.  IPF involves scarring of the lung where the air sacs of the lungs gradually become replaced by fibrotic tissue. When the scar forms, the tissue becomes thicker causing an irreversible loss of the tissue's ability to transfer oxygen into the bloodstream.  IPF usually occurs in patients over 50, is untreatable and invariably fatal – the average survival from time of diagnosis varies between 2.5 and 3.5 years.

17.    CGD is a primary genetic immunodeficiency, and patients suffering from CGD are more susceptible to a variety of infections.  Although the exact incidence of CGD in the United States is unknown, it is a very rare disorder that affects affects approximately 1 infant per 200,000-250,000 live births.  The potential market for Actimmune in this population would not exceeed $10 million annually.

18.    On February 14, 2000, the FDA approved Actimmune for delaying time to disease progression in patients with severe, malignant osteopetrosis - a thickening of the bones which become abnormally dense due an inherited genetic defect in bone resorption.

19.    Incidence of severe, malignant osteopetrosis in the United States is unknown, but worldwide estimates range between 1 in 100,000 and 1 in 500,000 births.  The disease is usually fatal during infancy.  Seventy percent of children with malignant infantile osteopetrosis die by age

1    six, and almost 100 percent do not live past age ten. This second indication for Actimmune did not

2    appreciably enlarge the drug's target patient population.

3        20.    On May 5, 1998, Genentech licensed exclusive rights for marketing and

4    development of interferon gamma (including Actimmune) to Connetics, Inc. ("Connetics"). The

5    licensing agreement called for Connetics to provide Genentech with, among other things, "a

6    description of Connetics' planned development and marketing programs for the twelve months

7    after the date of each such report." By January 1999, Genentech had stopped marketing

8    Actimmune itself.

9        21.    The license agreement allowed for a sublicense to InterMune to subsume Connetics'

10   marketing and development of Actimmune; such a sublicense was implemented three months later

11   on August 21, 1998. The sublicense was amended on December 28, 1998, January 15, 1999, and

12   April 27, 1999. In June 2000, Connetics assigned all of the rights in the sublicense to InterMune

13   through the year 2018 in exchange for a system of tiered sales royalties and milestone payments.

14       22.    Genentech was paid royalties by Connetics and/or InterMune on all Actimmune

15   sales after May 5, 1998.

16       23.    Actimmune was manufactured by Genentech in San Francisco, and by subsidiaries

17   of Boehringer Ingelheim in Europe. Actimmune was shipped from these manufacturers to

18   InterMune's contract distributor, Cardinal SPS, formerly known as CORD Logistics ("Cardinal"), a

19   subsidiary of Cardinal Health, Inc., headquartered in Dublin, Ohio. Cardinal then would ship

20   Actimmune from its warehouse in La Vergne, Tennessee, to secondary distributors throughout the

21   United States, which would in turn ship Actimmune to retail locations throughout the United

22   States.

23       24.    Defendants knew that Actimmune was not an effective therapy for treating IPF.

24   InterMune fraudulently cited negative clinical study results as positive results in treating IPF with

25   Actimmune. These studies showed that patients suffering from IPF either got no benefit from

26   Actimmune therapy, or in many cases actually had worse outcomes than patients who did not take

27   Actimmune.

28

CLASS ACTION COMPLAINT                          - 5 -

25.    In October 1999, the results of an Austrian study of 18 patients suffering from mild IPF were published in the New England Journal of Medicine.  Nine of the 18 patients had improved lung function in this study, but the investigators stated that a larger, more scientifically controlled study was needed to test whether these results were scientifically valid.

26.    Despite these modest conclusions, InterMune made false and outrageous exagerrations in U.S. Securities and Exchange Commission filings in 2000, stating "The results of a clinical trial published in October 1999 in The new England Journal of Medicine showed statistically significant evidence that interferon gamma-1b [Actimmune] can halt and reverse the progression of [IPF]."

27.    In October 2000, InterMune initiated the GIPF-001 Phase III clinical trial to determine whether Actimmune treatment, as compared to placebo, decreased disease progression and death in patients with IPF.

28.    In August 2002, InterMune and Harkonen received data showing that the GIPF-001 Phase III trial had failed.  Harkonen then directed InterMune employees to conduct post-hoc statistical analyses on subgroups of patients.  These analyses, while not statistically significant, showed a survival trend in patients with very mild IPF.

29.    On August 27, 2002, InterMune and Harkonen discussed the results of GIPF-001 with the FDA.  The FDA advised that the data were inconclusive and insufficient to get FDA approval for treating IPF with Actimmune, and that further study was needed.

30.    InterMune began designing another phase III trial, named INSPIRE, to determine if Actimmune therapy increased survival in patients with mild IPF.  The INSPIRE trial started in December 2003.

31.    On March 5, 2007, InterMune discontinued the INSPIRE trial because patients with IPF showed no benefit from Actimmune therapy.

**Marketing Actimmune for the treatment of IPF**

32.    InterMune always knew that the Actimmune would not be profitable from sales for CGD and severe, malignant osteopetrosis alone.  In 2000, InterMune acknowledged that:

To date, we have generated revenues primarily through the sale of ACTIMMUNE for chronic granulomatous disease. After consideration of the direct costs of marketing ACTIMMUNE for chronic granulomatous disease and severe, malignant osteopetrosis, and royalties we must pay to Genentech on sales of ACTIMMUNE, we do not currently generate any significant operating profits on those sales. Even if we succeed in developing ACTIMMUNE and Amphotec for additional diseases, we expect to incur net losses for at least the next three to five years and expect that these net losses will increase as we expand our research and development activities. If the time required to achieve profitability is longer than we anticipate, we may not be able to continue our business.

33.     InterMune devised and implemented a campaign of deceit and fraud to promote Actimmune for IPF, an indication for which it was not approved and had not been proven efficacious.  Defendants knew that Actimmune provided no medical benefit to patients with IPF. This campaign originated from and was controlled from InterMune's California headquarters.

34.     Defendants promoted and caused the promotion of Actimmune as a safe and effective treatment for IPF in order to increase Actimmune sales and increase InterMune's profits.

35.     At all relevant times, although kept apprised of the marketing activities, Genentech and Connetics did nothing to interfere with or stop the marketing of Actimmune as a safe and effective treatment for IPF, because pursuant to the license agreement, Genentech and Connetics profited from the increased sales of Actimmune.

36.     Harkonen and InterMune established sales goals and incentive programs for Actimmune and hired, trained, and directed sales representatives at InterMune to call on pulmonologists to market and sell Actimmune as a safe and effective therapy for treating IPF.   By 2002, InterMune admitted "that to meet the Actimmune sales goal for 2002, the company's field reps would vist approximately 6,800 pulmonologists." There are only about 7000 pulmonologists in the U.S.  Pulmonologists do not typically treat CGD or osteopetrosis.

37.     On August 28, 2002 InterMune issued a press release announcing the results of the GFIP-III clinical trial of Actimmune for the treatment of  IPF, falsely claiming the study demonstrated a survival benefit for patients with IPF and that Actimmune "reduces mortality by 70% in patients with mild to moderate disease."

38.    In October 2002, Defendants arranged for the nationwide distribution by facsimile and U.S. Mail of written marketing materials containing similar or identical false statements as the August 28, 2002 press release to thousands of pulmonologists and directly to patients taking Actimmune.    Defendants contracted Priority Healthcare Corporation (now Express Scripts, Inc. d/b/a/ CuraScript) ("Priority") to send these facsimile communications.

39.    At medical conferences for pulmonologists, Intermune set up booths for sales representatives to talk to attendees and distribute marketing information promoting Actimmune as a treatment for IPF, and arranged for and financed experts to deliver talks that mentioned Actimmune for the treatment of IPF.

40.    InterMune financed the creation of a purported nonprofit patient advocacy group, the Coalition for Pulmonary Fibrosis ("Coalition").    Intermune set and controlled the Coalition agenda, arranged for the Coalition's offices to be housed inside InterMune's public relations firm, Edelman Public Relations ("Edelman").    Michael Rosensweig, the director of another legitimate nonprofit patient support group, Pulmonary Fibrosis Foundation, aptly characterized the Coaltion as "a phony operation" and "a front for InterMune that was set up to sell Actimmune. . ."

41.    Defendants took cruel advantage of patients suffering from IPF by holding out false hope that Actimmune was a beneficial therapy for their terminal disease, and suppressed evidence that Actimmune was not efficacious for treating IPF.    Defendants exploited the fact that IPF was a terminal disease without any treatment or cure, and that physicians would prescribe a potentially life-saving drug.    Defendants' false statements, misrepresentations and omissions caused physicians to prescribe Actimmune to treat IPF, and third party payors, including Plaintiff and the Class, to pay for these Actimmune prescriptions.

42.    Defendants very successfully implemented and operated their fraudulent marketing scheme.    The vast majority of the company's sales of Actimmune were for the unapproved, off-label use of treating IPF as shown in the following table:

| Year | Total Actimmune Sales | Total Sales – All Other InterMune Products | Actimmune Sales as % of InterMune Total Sales |
|---|---|---|---|
| 1999 | $556,000 | $ 0 | 100 |
| 2000 | $11,201,000 | $ 0 | 100 |
| 2001 | $36,320,000 | $3,631,000 | 91 |
| 2002 | $105,802,000 | $6,163,000 | 95 |
| 2003 | $141,402,000 | $12,736,000 | 92 |
| 2004 | $124,980,000 | $26,007,000 | 83 |
| 2005 | $107,633,000 | $2,863 | 97 |
| 2006 | $90,317,000 | $ 0 | 100 |
| 2007 | $53,420,000 | $ 0 | 100 |
| 2008 (Q1 +Q2) | 15,800,000 | $ 0 | 100 |

43.     The average cost of Actimmune therapy for one IPF patient for one year was approximately $50,000, ranging from approximately $42,000 in 1999 to over $60,000 by 2005.

44.     Pharmacy benefits provided by private health insurance and benefit programs only require a small co-pay ($10 -$50 depending on the drug) by the insured for each prescription. Due to the astronomical price of Actimmune therapy, very few consumers can afford to pay for the drug themselves out-of-pocket, leaving governmental programs to pick to up the tab *ab initio* or to take over when their savings run out. For IPF patients with a private pharmacy healthcare benefit, third party payors pay for more than 99% of the cost of the Actimmune.

**Criminal Investigation and Plea**

45.     On October 26, 2006, InterMune was charged by the United States Attorney for the Northern District of California with federal criminal felony misconduct for promoting Actimmune for the treatment of IPF with the intent to defraud or mislead. In October 2006, InterMune agreed to enter into a deferred prosecution agreement and to pay nearly $37 million to to federal and state programs to resolve the criminal charges and civil liability pending against the company in connnection with the illegal promotion and marketing of its drug Actimmune. InterMune also

CLASS ACTION COMPLAINT                                    - 9 -

1    entered into a 5-year Corporate Integrity Agreement with the Office of Inspector General for the

2    Department of Health and Human Services.  The federal settlement addressed the economic harm

3    to some governmental payors, but it did not address the harm to consumers and nongovernmental

4    third-party payors.

5         46.    On March 18, 2008, the U.S. Department of Justice announced that Harkonen was

6    indicted on wire fraud and felony Food, Drug and Cosmetic Act charges for "his role in the

7    creation and dissemination of false and misleading information about the efficacy of Actimmune as

8    a treatment for IPF. . . Harkonen promoted and caused the promotion by InterMune of Actimmune

9    as a safe and effective treatment for IPF, despite the lack of FDA approval, in order to sell more

10   Actimmune and to generate revenues and profits from sales of the pharmaceutical for InterMune."

11        47.    By June 2008, InterMune reported sales of Actimmune declined by more than 50%

12   from the prior year "reflecting lower off-label physician prescriptions of Actimmune for the

13   treatment of [IPF]."

14                        **CLASS ACTION ALLEGATIONS**

15        48.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this

16   class action on behalf of itself and a class, defined as:

17
18         All third-party payors, health insurance companies, third-party administrators,
           health maintenance organizations, self-funded health and welfare benefit plans, and
19         any other health benefit provider, in the United States and its territories, excluding
           governmental entities, who, for purposes other than resale, purchased, reimbursed
20         and/or paid for the drug Actimmune between May 5, 1998 to present for the
           treatment of IPF.  For purposes of the Class definition, entities "purchased"
21         Actimmune if they paid some or the entire purchase price.

22        49.    Excluded from the Class are Defendants and any entity in which any Defendant has

23   a controlling interest, and their legal representatives, officers, directors, assignees, and successors.

24        50.    The Class consists of thousands of entities throughout the United States, making

25   individual joinder impractical, in satisfaction of Rule 23(a)(1).

26        51.    Plaintiff's claims are typical of the claims of the Class as required by Rule 23(a)(3),

27   in that Plaintiff, like all Class members, purchased and/or paid for Actimmune.

28

52.    Questions of law and fact are common to the Class and predominate over questions affecting only individual members, including the following:

a.    Whether the alleged conduct by Defendants violated laws as alleged in this Complaint;

b.    Whether Plaintiff and the Class Members are entitled to damages as a result of Defendants' conduct;

c.    Whether Plaintiff and the Class Members are entitled to equitable and/or injunctive relief;

d.    Whether Defendants' unlawful, unfair and/or deceptive practices harmed Plaintiff and the Class members; and

e.    Whether Defendants were unjustly enriched by their deceptive practices.

53.    Plaintiff's claims are typical of the claims of the Class Members, because their claims arise from the same course of conduct by Defendants and the relief sought is common.

54.    Plaintiff will fairly and adequately represent and protect the interests of all Class Members.  Plaintiff is represented by counsel competent and experienced in both consumer protection and class action litigation.  Plaintiff and its counsel are committed to the vigorous prosecution of this action on behalf of the Class and have the financial resources to do so.  Neither Plaintiff nor its counsel has any interests adverse to those of the Class.

55.    Class certification is proper under Fed. R. Civ. P. 23(b)(1)(A), because the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members and potentially establish incompatible standards of conduct for Defendants.

56.    Class certification is proper under Fed. R. Civ. P. 23(b)(3), because common issues of law and fact predominate over any questions affecting only individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

57.    Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

CLASS ACTION COMPLAINT                    - 11 -

58.    A class action is superior to other methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.    Furthermore, because the economic damages suffered by many of the individual Class Members may be relatively modest, albeit significant, compared to the expense and burden of individual litigation, it would be impracticable for Class Members to seek redress individually for the wrongful conduct alleged herein.

59.    Absent a class action, most members of the Class likely would find the cost of litigating their claims to be prohibitive, and will have no effective remedy at law.    The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

**FIRST CLAIM FOR RELIEF**
**(Violation of 18 U.S.C. §1962 (c))**

60.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

61.    Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962 (c).

62.    This claim, which alleges violations of Section 1962(c) of RICO, 18 U.S.C. § 1962(c), is asserted against Defendants on behalf of the Class.

63.    At all relevant times, in violation of 18 U.S.C. § 1962(c), Defendants conducted the affairs of an association-in-fact enterprise identified herein, the affairs of which affected interstate commerce through a pattern of racketeering activity.

**Actimmune IPF Enterprise**

64.    For purposes of this claim, the RICO "enterprise" is an association-in-fact consisting of each of the Defendants, Connetics, Priority, Coaltion, and Edelman including their directors, employees and agents and includes outside advertising agencies utilized by Defendants.

While maintaining their separate legal identities and titles, each of these entities and persons joined together to run the Enterprise. The association-in-fact is referred to herein as the "Actimmune IPF Enterprise." At all relevant times, the Actimmune IPF Enterprise is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating information about Actimmune, which all too often included disseminating false and misleading information for the purpose of trying to get Actimmune prescribed for the treatment of IPF, (b) jointly presenting data to the FDA and other medical journals that was misleading and/or has been manipulated to distort the results of clinical trials, (c) selling, promoting, and distributing Actimmune to Plaintiff and Class Members, (d) achieving as a goal of having Actimmune as the preferred treatment for IPF, and (e) deriving profits from these activities beyond those that could have been attained without operation of the Actimmune IPF Enterprise. The Actimmune IPF Enterprise had as a common purpose creating a demand for Actimmune in patients suffering from the incurable and fatal disease of IPF. Defendants have this as a purpose because without the Actimmune IPF Enterprise, they would not be able to sell Actimmune at the quantities and/or prices at which it was sold. During most of the time relevant to this Complaint, each Defendant maintained a separate legal identity while operating the Actimmune IPF Enterprise and others associated with and part of the Actimmune IPF Enterprise maintained their separate identities. Agents and members of the Actimmune IPF Enterprise include advertising agencies used to create Actimmune IPF advertisements and doctors who co-author articles promoting the efficacy of Actimmune. As to each Defendant, the association-in-fact met on a regular basis to discuss the operations of the Actimmune IPF Enterprise and the Enterprise's efforts were coordinated and agreed to by each Defendant.

65.     Each of the members of the Actimmune IPF Enterprise had a systemic linkage, because there are contractual relationships, financial ties and continuing coordination of activities between the Defendants and the Actimmune IPF Enterprise. As to each Defendant, there was a common communication network by which information concerning the Actimmune IPF Enterprise was exchanged on a regular basis. Typically this communication occurred by the use of electronic

1  mail or the telephone in which Defendants planned the operation of the Actimmune IPF Enterprise

2  alleged herein and ran its continuing operation.

3      66.    At all relevant times, each of the Defendants was a knowing participant in the

4  Actimmune IPF Enterprise and benefited from its operation.

5      67.    This is an enterprise within the meaning of 18 U.S.C. § 1961(4), consisting of each

6  Defendant, including their employees and agents.  The Actimmune IPF Enterprise is an ongoing

7  organization that functions as a continuing unit.  The Actimmune IPF Enterprise was created

8  and/or used as a tool to effectuate Defendant's pattern of racketeering activity.  The Defendant

9  "persons" are distinct from the Actimmune IPF Enterprise.

10      **Defendants' Use of the U.S. Mails and Interstate Wire Facilities**

11      68.    The Actimmune IPF Enterprise engaged in and affected interstate commerce

12  because it engaged in the following activities across state boundaries:  The transmission and

13  publication of false and misleading information concerning Actimmune; the sale, promotion and/or

14  distribution of Actimmune; and/or the transmission and/or receipt of sales and marketing literature;

15  and/or the transmission and/or receipt of invoices, statements and payments related to the use or

16  administration of Actimmune.

17      69.    Defendants' illegal conduct and wrongful practices were carried out by an array of

18  employees, as well as by consultants and doctors, working across state boundaries, who necessarily

19  relied upon frequent transfers of documents and information, products and funds by the U.S. mails

20  and interstate wire facilities.

21      70.    The nature and pervasiveness of the Actimmune IPF Enterprise, which was

22  orchestrated out of the corporate headquarters of Defendants, necessarily required those

23  headquarters to communicate directly and frequently by the U.S. mails and by interstate wire

24  facilities with the various local district managers overseeing the sales force(s), the numerous

25  pharmaceutical sales representatives who, in turn, directly communicated with healthcare

26  providers.

27      71.    Many of the precise dates of Defendants' uses of the U.S. mails and interstate wire

28  facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and

CLASS ACTION COMPLAINT                    - 14 -

1    cannot be alleged without access to these Defendants' books and records. Indeed, an essential part

2    of the successful operation of the Actimmune IPF Enterprise alleged herein depended upon

3    secrecy, and as alleged above, Defendants took deliberate steps to conceal their wrongdoing.

4    However, Plaintiff can generally describe the occasions on which the RICO predicate acts of mail

5    fraud and wire fraud occurred, and how those acts were in furtherance of the Actimmune IPF

6    Enterprise.

7          72.    Defendants' use of the U.S. mails and interstate wire facilities to perpetrate the

8    Actiummine IPF Enterprise involved thousands of communications, including *inter alia*:

9          a.    Marketing materials about Actimmune, which were sent by Defendants to

10   health care providers and patients located across the country;

11         b.    Television and print advertisements issued on dozens of occasions;

12         c.    Written representations made by Defendants, which were made at least

13   annually and in many cases several times during a single year;

14         d.    Written and oral communications directed to U.S. Government agencies that

15   fraudulently misrepresented Actimmune;

16         e.    Written and oral communications with health insurers and patients, including

17   Plaintiff and members of the Class, inducing payments that were made in reliance on the

18   safety and effectiveness of Actimmune for treating IPF;

19         f.    Receipts of money sent on thousands of occasions through the U.S. mails

20   and interstate wire facilities – the wrongful proceeds of the Actimmune IPF Enterprise;

21         i.    In addition to the above-referenced RICO predicate acts, it was foreseeable

22   to Defendants that others would distribute publications containing false information about

23   the effectiveness of Actimmune for treating IPF through the U.S. mails and by interstate

24   wire facilities. Further, Defendants' corporate headquarters have, in furtherance of the

25   Actimmune IPF Enterprise, communicated through use of the U.S. mails and by interstate

26   wire facilities with their various local headquarters or divisions. These uses of the U.S.

27   mails include some of the documents referenced in this Complaint.

28

CLASS ACTION COMPLAINT                    - 15 -

73.    The Actimmune IPF Enterprise engaged in and affected intestate commerce, because, inter alia, it marketed, sold, purchased, or provided Actimmune to thousands of individuals throughout the United States.

**Conduct of the RICO Enterprise's Affairs**

74.    Defendants exerted control over the Actimmune IPF Enterprise, and Defendants have participated in the operation or management of the affairs of the Actimmune IPF Enterprise, through the following actions:

a.    Defendants asserted direct control over the information and content disseminated to Plaintiff, members of the Class, and physicians regarding the efficacy of Actimmune for treating IPF;

b.    Defendants asserted direct control over the creation and distribution of mass-marketing and sales materials sent to Plaintiff, Class Members, and physicians throughout the United States; and

c.    Defendants placed their own employees and agents in positions of authority and control in the Enterprise.

75.    Each of the members of the Actimmune IPF Enterprise had a systemic linkage, because there are contractual relationships, financial ties and continuing coordination of activities between the Defendants and the Actimmune IPF Enterprise.  As to each Defendant, there was a common communication network by which information concerning the Actimmune IPF Enterprise is exchanged on a regular basis.  Typically this communication occurs by the use of electronic mail or the telephone in which Defendants plan the operation of the Actimmune IPF Enterprise alleged herein and ran its continuing operation.  This communication also occurred at meetings of the sales departments of each Defendant.

**Defendants' Pattern of Racketeering Activity**

76.    Defendants have conducted and participated in the affairs of the Enterprise through a pattern of racketeering activity that includes acts under 18 U.S.C. §§ 1341 and 1343 (mail and wire fraud), as described above.

77.     In implementing their fraudulent scheme, Defendants were aware that Plaintiff and Class Members depend on the honesty of Defendants in representing the safety and medical efficacy of Actimmune.

78.     Defendants' scheme was calculated to ensure that Plaintiff and the Class would pay for Actimmune treatment for IPF.

79.     Each of Defendants' fraudulent mailings and interstate wire transmissions constitute "racketeering activity" within the meaning of 18 U.S.C. § 1961 (1). Collectively, these violations constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961 (5).

80.     Defendants engaged in a pattern of racketeering activity intending to defraud Plaintiff and the Class.

81.     The above described racketeering activities amounted to a common course of conduct intended to deceive Plaintiff and the Class. Defendants' acts of racketeering had the same pattern and similar purpose of defrauding the Plaintiff and the Class. Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff and the members of the Class. Defendants' fraudulent activities are part of their ongoing business and constitute a continuing threat to the property of Plaintiff and Class Members.

82.     The pattern of racketeering activity alleged herein and the Enterprise are separate and distinct from each other. Defendants engaged in a pattern of racketeering activity alleged herein for the purpose of conducting the affairs of the Enterprise.

**Defendants' Motive**

83.     Defendants' motive in creating and operating the Actimmune IPF Enterprise and conducting the affairs of the Actimmune IPF Enterprise described herein was to fraudulently obtain sales and profits.

84.     The Actimmune IPF Enterprise was designed to, and did, encourage others, including health care providers, to advocate the use of Actimmune. Thus, each Defendant used the Actimmune IPF Enterprise to sell more Actimmune, thereby fraudulently gaining sales, market share, and profits.

**Damages Caused by Defendants' Enterprise**

85.    Plaintiff and members of the Class have been injured in their property by reason of these violations in those Plaintiff and members of the Class have paid millions of dollars for Actimmune for treating IPF that they would not have paid had Defendants not engaged in their pattern of racketeering activity.

86.    Plaintiff and members of the Class relied to their detriment on Defendants' fraudulent misrepresentations and omissions.

87.    Plaintiff's and Class members' injuries were directly and proximately caused by Defendants' racketeering activity as described above.

88.    Under the provisions of Section 1962(c) of RICO, Defendants are jointly and severally liable to Plaintiff and members of the Class for three times the damages that Plaintiff and the Class Members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

**SECOND CLAIM FOR RELIEF**
**(Violation of 17 U.S.C. §(d) By Conspiring To Violate 18 U.S.C. § 1962(c))**

89.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

90.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

91.    Defendants have violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the § 1962(c) Enterprise described previously through a pattern of racketeering activity.

92.    As demonstrated in detail above, Defendants as co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Plaintiff and the Class of money.

93.    The nature of the above demonstrates that Defendants as co-conspirators made material misrepresentations and omissions in furtherance of the conspiracy, which gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent and extortionate acts have been and are part of an overall pattern of racketeering activity.

94.    As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violation 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiff and Class Members have been and are continuing to be injured in their business or property as set forth more fully above.

95.    Defendants have sought to, have engaged in the commission of, and continue to commit overt acts, including the following unlawful racketeering predicate acts:

a.    Multiple instances of mail and wire fraud violations of 18 U.S.C. §§ 1341 and 1342;

b.    Multiple instances of mail fraud violations of 18 U.S.C. §§ 1341 and 1346; and

c.    Multiple instances of wire fraud violations of 18 U.S.C. §§ 1343 and 1346.

96.    Defendants' violations of the above federal laws and the effects thereof detailed above are continuing and will continue unless injunctive relief prohibiting Defendants' illegal acts constituting a pattern of racketeering activity is fashioned and imposed by the Court.

### THIRD CLAIM FOR RELIEF
#### (Violation of the State Consumer Protection Laws)

97.    Plaintiff hereby restates and realleges each and every allegation set forth above.

98.    Defendants had a statutory duty to refrain from unfair or deceptive acts or practices in the manufacture, promotion and sale of Actimmune.

99.    Defendants portrayed Actimmune as a safe and effective therapy for treating IPF without any statistically significant evidence for doing so and in contradiction to the FDA-approved label;

100.    Defendants promoted the safety and efficacy of Actimmune above and beyond the safety and efficacy information in its FDA-approved labeling in order to induce doctors to

1  prescribe Actimmune for treating IPF and consumers and Third-Party Payors to purchase

2  Actimmune for treating IPF.

3      101.   Defendants established Actimmune as a standard course of treatment of IPF based

4  upon the use of reprints of articles appearing in prestigious medical journals which Defendants

5  knew were false and/or misleading.

6      102.   Defendants committed unlawful acts by promoting and advertising Actimmune in a

7  manner that violated the Federal Food, Drug, and Cosmetic Act.  See 21 U.S.C. §§ 331(a) and (b),

8  352(a), (f), and (n) and 355(a).

9      103.   Had Defendants not engaged in the deceptive conduct described above, Plaintiff and

10 the Class Members would not have purchased and/or reimbursed for Actimmune prescribed for

11 treating IPF.

12     104.   Defendants' actions, as complained of herein, constitute unfair competition or

13 unfair, unconscionable, deceptive or fraudulent acts or practices in violation of various state

14 consumer protection statutes that allow third-party payors to bring claims.  Plaintiff asserts this

15 claim on behalf of third-party payors located in the states that permit TPP claims under the

16 consumer protection laws as set forth below.

17        a.    Defendants have engaged in unfair competition or unfair or deceptive acts or

18      practices in violation of Alaska Stat. Code § 40.50.471, *et seq.*;

19        b.    Defendants have engaged in unfair competition or unfair or deceptive acts or

20      practices in violation of Ariz. Rev. Stat. § 44-1522, *et seq.*;

21        c.    Defendants have engaged in unfair competition or unfair or deceptive acts or

22      practices in violation of Ark. Code § 4-88-101, *et seq.*, including § 4-88-113(f), and

23      § 4-8-102(5);

24        d.    Defendants have engaged in unfair competition or unfair or deceptive acts or

25      practices in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.* and the Consumer Legal

26      Remedies Act, Civ. Code § 1750 *et seq.* ("CLRA");

27

28

1    e.    Defendants have engaged in unfair competition or unfair or deceptive acts or

2    practices in violation of Colo. Rev. Stat. § 6-1-105, *et seq.*, including § 6-1-113(1)(c) and

3    § 6-1-102(b);

4    f.    Defendants have engaged in unfair competition or unfair or deceptive acts or

5    practices in violation of Conn. Gen. Stat. § 42-110b, *et seq.*, including § 42-110(a)(3);

6    g.    Defendants have engaged in unfair competition or unfair or deceptive acts or

7    practices in violation of 6 Del. Code § 2511, *et seq.*, including 6 Del. Code § 2512;

8    h.    Defendants have engaged in unfair competition or unfair or deceptive acts or

9    practices in violation of D.C. Code § 28-3901, *et seq.*, including § 28-390(1);

10    i.    Defendants have engaged in unfair competition or unfair or deceptive acts or

11    practices in violation of Fla. Stat. § 501.201, *et seq.*;

12    j.    Defendants have engaged in unfair competition or unfair or deceptive acts or

13    practices in violation of Haw. Rev. Stat. § 480, *et seq.*, including § 481A-2;

14    k.    Defendants have engaged in unfair competition or unfair or deceptive acts or

15    practices in violation of Idaho Code § 48-601, *et seq.*, including § 48-602;

16    l.    Defendants have engaged in unfair competition or unfair or deceptive acts or

17    practices in violation of 815 ILCS § 505/1, *et seq.*;

18    m.    Defendants have engaged in unfair competition or unfair or deceptive acts or

19    practices in violation of Md. Com. Law Code § 13-101, *et seq.*, including § 13-101(h);

20    n.    Defendants have engaged in unfair competition or unfair or deceptive acts or

21    practices in violation of Mass. Gen. L. Ch. 93A, *et seq.*;

22    o.    Defendants have engaged in unfair competition or unfair or deceptive acts or

23    practices in violation of Mich. Stat. § 445.901, *et seq.*, including § 445-902(c);

24    p.    Defendants have engaged in unfair competition or unfair or deceptive acts or

25    practices in violation of Minn. Stat. § 325F.67, *et seq.*, including § 407.010(5);

26    q.    Defendants have engaged in unfair competition or unfair or deceptive acts or

27    practices in violation of Vernon's Mo. Rev. Stat. § 407.010, *et seq.*;

28

**CLASS ACTION COMPLAINT**                - 21 -

1      r.      Defendants have engaged in unfair competition or unfair or deceptive acts or

2  practices in violation of Mont. Code § 30-14-101, *et seq.*, including § 30-14-102(5);

3      s.      Defendants have engaged in unfair competition or unfair or deceptive acts or

4  practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*, including § 59-160(1);

5      t.      Defendants have engaged in unfair competition or unfair or deceptive acts or

6  practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*;

7      u.      Defendants have engaged in unfair competition or unfair or deceptive acts or

8  practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*, including § 358-A:1(1);

9      v.      Defendants have engaged in unfair competition or unfair or deceptive acts or

10  practices in violation of N.J. Stat. Ann. § 56:8-1, *et seq.*, § 56:8-1(d);

11      w.      Defendants have engaged in unfair competition or unfair or deceptive acts or

12  practices in violation of N.M. Stat. Ann. § 57-12-1, *et seq.*;

13      x.      Defendants have engaged in unfair competition or unfair or deceptive acts or

14  practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*;

15      y.      Defendants have engaged in unfair competition or unfair or deceptive acts or

16  practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*;

17      z.      Defendants have engaged in unfair competition or unfair or deceptive acts or

18  practices in violation of N.D. Cent. Code § 51-15-01, *et seq.*, including § 51-15-01(4);

19      aa.      Defendants have engaged in unfair competition or unfair or deceptive acts or

20  practices in violation of Ohio Rev. Stat. § 1345.01, *et seq.*, including § 1345.01(B);

21      bb.      Defendants have engaged in unfair competition or unfair or deceptive acts or

22  practices or made representations in violation of Okla. Stat. tit. 15 § 751, *et seq.*;

23      cc.      Defendants have engaged in unfair competition or unfair or deceptive acts or

24  practices in violation of Or. Rev. Stat. § 646.605, *et seq.*, including § 646.605(4);

25      dd.      Defendants have engaged in unfair competition or unfair or deceptive acts or

26  practices in violation of 73 Pa. Stat. § 201-1, *et seq.*, including § 201-2(2);

27      ee.      Defendants have engaged in unfair competition or unfair or deceptive acts or

28  practices in violation of R.I. Gen. Laws. § 6-13.1-1, *et seq.*, including § 6-13.1(3);

ff.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws § 39-5-10, *et seq.*, including § 39-5-10(9);

gg.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1, *et seq.*, including § 37-24-1(8);

hh.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, *et seq.*, including § 47-18-103(9); Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann. § 13-1 1-1, *et seq.*;

ii.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tex. Bus. & Com. Code § 17.41, *et seq.*, including § 17.45(4);

jj.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code § 59.1-196, *et seq.*, including § 59.1-198;

kk.    Defendants have engaged in unfair competition or unfair, deceptive acts or fraudulent acts or practices in violation of Wash. Rev. Code § 19.86.010, *et seq.*, including § 19.86.010(1);

ll.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code § 46A-6-101, *et seq.*;

mm.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wis. Stat. § 100.20, *et seq.*; and

nn.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wyo. Stat. § 40-12-100, *et seq.*, including § 40-12-102(a)(i).

105.    Either directly or indirectly (through their physicians), Plaintiff and the Class Members relied upon Defendants' misrepresentations and/or omissions (as described herein) in purchasing and/or reimbursing Actimmune prescribed for the treatment of IPF.

106.    Plaintiff and members of the Class were injured by the cumulative and indivisible nature of Defendants' conduct. The cumulative effect of Defendants' conduct directed at Third-Party Payors, physicians and consumers was to artificially create demand for Actimmune for

1    treating IPF.    Each aspect of Defendants' conduct combined to artificially create sales of

2    Actimmune and/or to result in overpayments by Class Members.

3        107.    As a direct and proximate result of Defendants' unfair methods of competition and

4    unfair or deceptive acts or practices, Plaintiff and the Class Members have suffered actual

5    economic damages by purchasing and/or reimbursing Actimmune prescribed for the treatment of

6    IPF.

7                        **FOURTH CLAIM FOR RELIEF**
                         **(Unjust Enrichment)**
8

9        108.    Plaintiff hereby restates and realleges each and every allegation set forth above.

10       109.    Defendants have received benefits from Plaintiff and the Class Members in the form

11   of the prices Plaintiff and the Class Members paid for Actimmune during the Class Period.  Due to

12   Defendants' conduct described herein, Defendants reaped millions of dollars in profits that they

13   otherwise would not have obtained and caused Plaintiff and the Class Members to expend monies

14   on the extremely expensive drug Actimmune for treatment of IBF.

15       110.    Defendants are aware of their receipt of those benefits.

16       111.    Defendants voluntarily accepted and retained these payments with full knowledge

17   and awareness that, as a result of their wrongdoing, Plaintiff and the Class paid for Actimmune

18   when they otherwise would not have done so but for the Defendants' wrongful conduct.

19       112.    Defendants continue to retain those benefits to the detriment of Plaintiff and the

20   Class Members.

21       113.    As a result of Defendants' unjust enrichment, Plaintiff and the Class Members have

22   sustained damages in an amount to be determined at trial and seek full disgorgement and restitution

23   of Defendants' ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged

24   above.

25       114.    Plaintiff and the Class are entitled in equity to seek restitution of Defendants'

26   wrongful profits, revenues and benefits to the extent and in the amount, deemed appropriate by the

27   Court and such other relief as the Court deems just and proper to remedy Defendants' unjust

28   enrichment.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants in each claim for relief, jointly and severally, as follows:

A.     The Court determines that this action may be maintained as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure with respect to Plaintiff's claims for declaratory, equitable and injunctive relief, and Rule 23(b)(3) of the Federal Rules of Civil Procedure with respect to the claims for damages, and declaring Plaintiff and its counsel as proper representatives of the Class; and designating such 23(c)(4)(A) class issues and/or 23 (c)(4)(B) subclasses as appropriate.

B.     For an Order appointing the undersigned counsel as Class counsel;

C.     The conduct alleged herein be declared, adjudged and decreed to be unlawful;

D.     Plaintiff and the Class be granted an award of damages in such amount to be determined at trial, with treble damages as provided by law, and prejudgment interest on all damages;

E.     Plaintiff and the Class be granted an award of punitive damages in such amount to be determined at trial;

F.     Defendants be enjoined from continuing the illegal activities alleged herein;

G.     Plaintiff and the Class recover their costs and expenses of this litigation, including reasonable attorneys' fees and expert fees as provided by law; and

H.     Plaintiff and the Class be granted such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a jury trial on all issues so triable.

Respectfully submitted, this 7th day of August, 2008.

KAHN GAUTHIER SWICK, LLC

/s/ Kim E. Miller
Kim E. Miller (CA Bar. No. 178370)
Kahn Gauthier Swick, LLC
12 E. 41st St., 12th Floor
New York, NY 10017
Tel:  (212) 696-3730
Fax: (504) 455-1498

Lewis S. Kahn (La. Bar. No. 23805)
Kahn Gauthier Swick, LLC
650 Poydras Street, Suite 2150
New Orleans, LA 70130
Tel:  (504) 455-1400
Fax: (504) 455-1498

Douglas R. Plymale (La. Bar No. 28409)
dplymale@dugan-lawfirm.com
James R. Dugan, II (La. Bar No. 24785)
jdugan@dugan-lawfirm.com
Justin Bloom
jbloom@gmail.com
Stephen B. Murray, Jr.
smurrayjr@murray-lawfirm.com
Stephen B. Murray, Sr.
smurray@murray-lawfirm.com
MURRAY LAW FIRM
650 Poydras Street, Suite 2150
New Orleans, LA 70130
Telephone: (504) 648-0180
Facsimile: (504) 648-018

Attorneys for Plaintiff and the Class